UNITED STATES DISTRICT COURT
NORTHERN DISTRICT COURT OF OHIO

OCT 1 2 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

Mr. Rosel C. Hurley III.,
12800 Shaker Boulevard, STE 230          Judge Donald Nugent
Cleveland, OH 44120
    Plaintiff,

   -vs-               :

                        Civil Action No. 1:21cv1099

                :

National Basketball Players Association,  :
National Basketball Association,  et al.
    Defendant,

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO COMPEL ARBITRATION AND DISMISS

      Defendants' Motion to Compel Arbitration and Dismiss ignores the key factual allegations in Plaintiffs' Complaint and mischaracterizes many others. In addition, Defendants' Motion is premised upon a mistakenly narrow analysis of the constitutional provisions on which Plaintiffs rely for their claims.

## STANDARD OF REVIEW ON A MOTION TO DISMISS

      As the Court is well aware, when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must assume that the plaintiffs' factual allegations are true, and it must view those allegations, and all reasonable inferences from them, in their favor. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127

1

S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 336 (6th Cir.2007)... City of Cleveland v. Ameriquest Mortg. Sec. Inc., 615 F.3d 496 (6th Cir. 2010)

The Courts have further stated in regards to Motion to Dismiss under Rule 12(b)(6)...."To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988) (internal quotation marks and citations omitted).

The Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993). "When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1039-40 (6th Cir. 1991). "[A] complaint should be dismissed for failure to state a claim only where 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1189 (6th Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

## ARBITRATION

Plaintiff has no opposition to resolving the denial of my application for certification by arbitration.  Plaintiff has always wanted to arbitrate the issue of denial of certification. Once Plaintiff received notification of my denial of certification on February 10, 2021,

2

after approval, which Plaintiff received notification of on December 2, 2021, Plaintiff followed the procedures laid out in Section 5 of the NBPA regulations.  Plaintiff emailed the NBPA, specifically Mr. Clarence Nesbitt, General Counsel of the NBPA on March 3, 2021 of intentions for arbitration (Exhibit A), and Plaintiff sent a letter by FEDEX, on March 3, 2021 (Exhibit B) which was unclaimed by defendants.

In regards to the other issues brought up by Defendants, Plaintiffs would like to inform the Court that he has made mistakes in the past but Plaintiff has made attempts to right the wrongs he has made.  But what the Defendants fail to mention is that all those issues were disclosed to the Defendants at the beginning of the application process on August 19, 2021, (Exhibit C).The felony conviction and other issues were was disclosed on Plaintiff's application, no copies of application was available to Plaintiff since it was an imbedded web application.  The Defendants fail to mention Plaintiff completed his background questionnaire on August 26, 2021 (Exhibit D).

Defendants fail to mention in regards to the hit skip that happened in 2003 they have known about the incident since 2008 when they certified Plaintiff and allowed him to take the exam which he passed. Knowing all this the Defendants approved Plaintiff's application for certification on  December 2, 2021 (Exhibit E).  In regards to Plaintiff's law license, which the Defendants admit was disclosed, the defendants fail to mention that Plaintiff has been reinstated to the practice of law (Exhibit F).

In regards to the letters Plaintiff wrongly sent out, they were written to companies that had blanket exclusionary policies related to hiring felons which in some instances can be in violation of federal law. Plaintiff admits he was wrong in writing them on firm letterhead and has profusely apologized to the Ohio Supreme Court and his peers for

his actions and Plaintiff admits he deserved the punishment he received as result of his actions.

The Defendants also mention in their Motion to Compel Arbitration and Dismiss the Case that the Plaintiff rejected arbitration.  The Plaintiff was presented an offer of arbitration by the Defendants but it was conditioned on the Plaintiff dismissing his case. Plaintiff does not want to dismiss the Sherman Antitrust violations he believes was committed by the Defendants as the limited Arbitration Agreement listed in Section 5 of the NBPA regulations does not cover these infractions.

## SHERMAN ANTITRUST VIOLATIONS

### I.  COLLECTIVE BARGAINING AGREEMENT

Defendants state that the Plaintiff's Sherman action claims fail because of the statutory exemption.  In H.A. Artists & Associates v. Actors' Equity Ass'n, the U.S. Supreme Court held that labor unions acting in their own self-interest and not in combination with nonlabor groups—for example, by enacting regulations that govern agents— are statutorily exempt from the antitrust laws. 27Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 541 (1985).

The statutory exemption does not apply to Article XXXI, specifically section 2 and section 4, of the NBPA Regulations as since the NBA is a non-labor member and the stronger party of the partnership in a de facto principal-agent relationship. These two sections are ambiguous, and as such, benefit the stronger party to the detriment of the

junior partner, the NBPA. § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," Theatre Enterprises, 346 U.S., at 540, 74 S. Ct. 257.

The NBA is using a carrot-stick approach for compliance with Section 2 of Article XXXVI is the stick as thousands of NBA transactions are completed each year. Multiplying each transaction by $50000 would amount to an insurmountable amount of fines.

> Section 2 | FINES
> The NBA shall impose a fine of $50,000 upon any Team that negotiates a Player Contract with an Agent or representative not certified by the Players Association in accordance with the Players Association's Regulations Governing Player Agents if, at the time of such negotiations, such Team either (a) knows that such Agent or representative has not been so certified, or (b) fails to make reasonable inquiry of the NBA as to whether such Agent or representative has been so certified. Notwithstanding the preceding sentence, in no event shall any Team be subject to a fine if the Team negotiates a Player Contract with an Agent or representative designated as the Player's authorized Agent on the then-current Agent list provided by the Players Association to the NBA in accordance with Section 5 below.

It is true that Section 2 states that the team shall be fined $50000 by the NBA but Section 4 of Articles XXXVI insulates the NBA teams from the fine to the detriment and against the self interest of the NBPA.

> Section 4 | Indemnity
> The Players Association agrees to indemnify and hold harmless the NBA, its Teams and each of its and their respective past, present and future owners (direct and indirect) acting in their capacity as Team owners, officers, directors, trustees, employees, successors, agents, attorneys, heirs, administrators, executors and assigns, from any and all claims of

any kind arising from or relating to (a) the Players Association's Regulations Governing Player Agents, and (b) the provisions of this Article, including, without limitation, any judgments, costs and settlements, provided that the Players Association is immediately notified of such claim in writing (and, in no event later than five (5) days from the receipt thereof), is given the opportunity to assume the defense thereof, and the NBA and/or its Teams (whichever is sued) use their best efforts to defend such claim, and do not admit liability with respect to and do not settle such claim without the prior written consent of the Players Association.

These two sections make the agreement ambiguous and circular in nature as Section 2 fines the teams for conduct detrimental to the NBPA but Section 4 indemnifies the teams and its owners for any and all conduct related to and arising from (a) the Players Association's Regulations Governing Player Agents including any judgments, cost and settlements, which is to the detriment of the NBPA. Under Ohio law, interpretation of written contract terms is a matter of law for initial determination by the court. It is only when the relevant contract language is ambiguous that the job of interpretation is turned over to the factfinder, ... and the determination whether a contract is ambiguous is made as a matter of law by the court....Lemley v. Ford Motor Co., 36 F.3d 1097 (6th Cir. 1994)

"Ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." Potti, 938 F.2d at 647. If a contract does contain ambiguities, they must be construed against the drafting party: "he who speaks must speak plainly or the other party may explain to his own advantage." McKay Mach. Co. v. Rodman, 228 N.E.2d 304, 307 (Ohio 1967); see Franck v. Railway Express Agency, 112 N.E.2d 381, 383 (Ohio 1953); Ottery v. Bland, 536 N.E.2d 651, 654 (Ohio Ct.App.1987). If the court

determines that an agreement is ambiguous, its meaning becomes a question for the factfinder, who may consider extrinsic or parol evidence to assess the intent of the parties. See Ohio Historical Soc. v. General Maintenance and Eng'g Co., 583 N.E.2d 340, 344 (Ohio Ct.App.1989)...Lemley v. Ford Motor Co., 36 F.3d 1097 (6th Cir. 1994)

Based upon the ambiguous terms agreed to against the interest of the Defendant NBPA and its members, Article XXXVI and its sections are in violation of the Sherman Anti-trust laws and encourages the arbitrary actions by the Defendants as in actions done against the Plaintiff, such as approving his application on December 2, 2020 and then denying him two days before the exam on February 10, 2021, essentially denying him due process.  "The statutory exemption extends to legitimate labor activities unilaterally undertaken by a union in furtherance of its own interests.  It does not extend to concerted actions or agreements between unions and non-labor groups.  See United States v. Hutcheson, 312 U.S. 219, 61 S. Ct. 463, 85 L.Ed. 788 (1941).

We pointed out in Pennington that exemption for union-employer agreements is very much a matter of accommodating the coverage of the Sherman Act to the policy of the labor laws. Employers and unions are required to bargain about wages, hours and working conditions, and this fact weighs heavily in favor of antitrust exemption for agreements on these subjects. But neither party need bargain about other matters and either party commits an unfair labor practice if it conditions its bargaining upon discussions of a nonmandatory subject. Labor Board v. Borg-Warner Corp., 356 U.S. 342. Jewel, for example, need not have bargained about or agreed to a schedule of prices at which its meat would be sold and the unions could not legally have insisted that it do so. But if the unions had made such a demand, Jewel had agreed and the

United States or an injured party had challenged the agreement under the antitrust laws, we seriously doubt that either the unions or Jewel could claim immunity by reason of the labor exemption, whatever substantive questions of violation there might be. Local Union 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965)

## II.  PER SE VIOLATION

The actions done by Defendant upon the Plaintiff also show that Defendants actions were done at the behest of a non-party to the collective bargaining agreement. Plaintiff specifically argues that based upon the unreasonable actions of the Defendant as listed in the complaint, such as that after approving the Plaintiff's application for certification on December 2, 2020 and then denying his certification on February 10, 2021, two days before the exam on February 12, 2021, that Defendants actions were at the behest of a non-union member and had an unreasonable effect on trade. "Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition. See Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)

Plaintiff specifically asked Defendant if he was in contact with anyone from Cleveland in regards to his application, (Exhibit F). Defendant refused to answer the question. Through discovery it can possibly be determined if Plaintiff's denial of certification was done at the behest of a non-union member, which would be a per-se

violation of the Sherman Antitrust Act. exposing the Defendant to liability under Section 4 of the Clayton Act and treble damages.

In regards to this issue Plaintiff also has a pending contested mandamus action going forward in Cuyahoga County Common Pleas Court (CV-21-947861) which could yield relevant evidence in this case.  Plaintiff has also used the power of the subpoena to acquire relevant evidence for this case which have not been fully complied with as of yet and is being contested.  In regards to situations like this the court has held that "the Court recognizes that it is the rare case in which a plaintiff bringing a § 1 claim can establish the existence of an explicit agreement among the defendants; most conspiracies are proven by inferences drawn from behavior of the alleged conspirators." The court in this case further stated, "The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective"…Monsanto, 465 U.S. at 768, 104 S.Ct. at 1473.

Antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus in Monsanto, we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence that `tends to exclude the possibility' that the alleged conspirators acted independently. Respondents in this case, in other words, must show that the inference of conspiracy [825 F. Supp. 566] is

reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents….Caldwell v. American Basketball Ass&#39;n, Inc., 825 F. Supp. 558 (S.D. N.Y. 1993)

As cited in the previous issues "the Hutcheson Court held that labor unions acting in their self interest and not in combination with non labor groups are exempt from Sherman Act liability. In [850 F. Supp. 1477] Hutcheson, a union struck, picketed and boycotted its employer in support of the union's claimed right to perform work given by the employer to a rival union. The Court noted that the union's activities were protected by § 20 of the Clayton Act and held that they did not violate the Sherman Act. So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under Section 20 of the Clayton Act are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means…. Hutcheson, 312 U.S. at 232, 61 S.Ct. at 466..  Collins v. National Basketball Players Ass&#39;n, 850 F. Supp. 1468 (D. Colo. 1991).

Only through discovery can it be determined if there consisted of a conspiracy with a non-labor member to deny Plaintiff's approved application and access to the NBPA Agent Certification Exam knowing there was a good chance the Plaintiff would pass the exam since he has passed it before, thus showing conduct arising to a per se violation of the Sherman Antitrust law.

## ARBITRATION AGREEMENT

Plaintiff is aware that a Sherman Trust Act violation may be submitted for arbitration… "Subsequently, the Court has held that even if international commerce is not involved, arbitration clauses are applicable to claims arising from federal statutes, unless the statute reveals a congressional intention to preclude a waiver of judicial remedies." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991); Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226-27, 239 (1987). But the Defendants fail to mention that this fact is subject to analysis (1) have the parties agreed to arbitrate; and (2) does their dispute fall within the scope of their agreement to arbitrate?

The courts further state the following: "Before compelling an unwilling party to arbitrate, [we] must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

The following principles guide our inquiry: (1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; (2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination; (3) in making this determination, a court is not to consider the merits of the underlying claim; and (4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any

11

doubts in favor of arbitration, and should not deny an order to arbitrate "unless it may be said with positive assurance, No. 19-5464, *United Steel v. LLFlex* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)

The analysis should determine if the arbitration clause is limited or broad in nature, covering all aspects of any disagreement.  As it pertains to the arbitration clause found at Section 5 of the NBPA Regulations it is clearly shown its limited nature and tow what type of disputes it can arbitrate as the section only list three situations in which it may be applied.

> The provisions of the Arbitration Section shall apply with respect to three types of disputes that may arise under these Regulations;
> 1.  The NBPA denies an Application and the applicant wishes to appeal from that action;
> 2.  A dispute arises with respect to the meaning, interpretation, or enforcement of a SPAC (described in Section entered into between a Player and the Player Agent;
> 3.  A dispute arises between two or more Player agents with respect to their individual entitlement to fees owed, whether paid or unpaid, by a Player who was jointly represented by such Player Agents. In such cases, at the Player's option, any fees paid or payable by the Player after the dispute arises shall be placed in escrow pending final resolution of such dispute, and paid out of escrow in accordance with the Arbitrator's decision.

These restrictions show the limited scope of the Defendants arbitration clause and that it does not apply to federal statutes such as Sherman Act antitrust violations. The Sherman trust violations committed by the Defendant are inchoate by nature and were done with their own animus, totally separate from the denial of certification.

12

# **DAMAGES**

In regards to the injuries suffered by the Plaintiff as a result of Defendant's conduct the Courts have stated the following ...."Section 1 of the Sherman Act prohibits any "'contract, combination . . ., or conspiracy' between two or more persons that unreasonably restrains trade in interstate commerce." Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1009 (6th Cir. 1999) (quoting 15 U.S.C. § 1), petition for cert. filed, 68 U.S.L.W. 3138 (U.S. August 17, 1999) (No. 99-294). The statute goes further and states that Section 4 of the Clayton Act broadly defines the class of persons entitled to seek treble damages for an antitrust violation. 15 U.S.C. § 15. The relevant language provides, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States. . . and shall recover threefold the damages by him sustained, and the costs of the suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

Courts further state the following…"A plaintiff must allege facts showing that it suffered an "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." Brunswick Corp., v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977). 13 See also William C. Holmes, Antitrust Law Handbook § 8.03[1][a] at 791 (1999). This definition of "antitrust injury" involves "two separate analytical issues. First, the claimed injury must be of a type that the antitrust laws were meant to discourage. And second, the plaintiff's injury must be causally related to the defendant's anticompetitive acts." Id. "Issues of causation are, thus, brought into the analysis as a second step even after the determination has been made that the nature of the alleged harm is of potential antitrust concern." Id. at 798-800.

Explained more fully, the Brunswick test forces antitrust courts to connect the alleged injury to the purposes of the antitrust laws. Compensation for that injury must be consistent with the purposes of antitrust law generally and with the rationale for

13

condemning the particular defendant" ….As the Brunswick Court further stated, "the injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" Brunswick, 429 U.S. at 489 (footnote omitted) (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969)).

The antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation in the first place." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990). Although antitrust violations may have three, often interwoven, effects, "the antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior", not from a competition-increasing or competition-neutral aspect of the defendant's behavior. Id. at 343. See also Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1557 (Fed. Cir. 1997).

The Court has further established and held in Associated General Contractors v. Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), a five-part inquiry to determine whether a private party has standing to bring action under the antitrust laws. In that case the stated the following test: 1) whether a causal connection exists between the antitrust violation and the alleged injury; 2) the nature of the alleged injury; 3) whether the asserted injury is direct, or indirect and, therefore, too speculative; 4) the potential for duplicative recovery or a complex apportionment of damages; and 5) the existence of an identifiable class of persons better suited to vindicate the public interest in antitrust enforcement. See id. at 537-544, 103 S.Ct. at 908-912;

14

Defendants fail to mention that an NBA player who was eligible for an extension this 2021 NBA off-season is a personal reference on Plaintiff's application.  As a result of the revocation of the Plaintiff's certification after approval, the Plaintiff was denied the possibility to represent the Player and thus suffered a loss as a result of Defendant's conduct as the Player signed an extension August 2021.  The Defendants actions caused an irreversible injury to the Plaintiff as the opportunity to represent the player(s) during max extension contract negotiation was not available.

In this case only through discovery can it be determined if there is a direct connection between the antitrust violation and the alleged injury.  Discovery proceedings would show if other applicants were granted approval for the NBPA Certification Exam and then denied unreasonable access to the exam two days before the examination date.  Only through discovery proceedings can it be discovered the nature of the injury, is it a per-se violation of the Sherman Antitrust law as a result of the conspirarying with a non-union member, or is the Collective Bargaining Agreement itself a Sherman Antitrust violation, only through discovery proceedings can the direct nature of the injury can be realized, did other applicants suffer under the same conduct as defendant, only through a proper discovery proceeding can it be determined that there is a potential for duplicative or a complex apportionment of damages, and the existence of an identifiable class of persons better suited to vindicate the public interest in antitrust enforcement.

Courts have further stated the following in regards to damages…"as to the required causal connection between Plaintiffs' alleged antitrust violation and injury suffered, the Supreme Court has observed that an antitrust plaintiff must demonstrate

"some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage"; and therefore "it is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4 [of the Clayton Act]." Zenith Radio Corp., 395 U.S. at 114 n. 9 (emphasis added). Accord, Allied Accessories & Auto Parts Co., Inc. v. General Motors Corp., 901 F.2d 1322, 1325 (6th Cir. 1990).

The court in Id. went further stating the following.."Professors Areeda and Hovenkamp have likewise observed that, "while all courts demand a showing of injury-in-fact 'caused' by an antitrust violation, to require proof that the illegal conduct was the exclusive cause of the plaintiff's injury would effectively deny private remedies, for multiple causes always affect everyone. Accordingly, the Supreme Court has declared that the plaintiff need show only that the violation is a 'material cause' of the claimed injury." 2 P. Areeda & H. Hovenkamp, supra, P 363a at 219 (rev. ed. 1995). "It is therefore enough that the antitrust violation contributes significantly to the plaintiff's injury even if other factors amounted in the aggregate to a more substantial cause." Id. at 219-220. "Thus, a plaintiff initially obtains standing by showing that the alleged violation contributed significantly to his injury. Ultimately, of course, he must provide the jury with a reasonable basis for separating the impact of the violation from the other forces affecting him." Id. at 221.

The Court further stated that the analysis could be a question of fact…"If there is sufficient evidence in the record to support an inference of causation between the antitrust violation and the injury suffered, the ultimate conclusion as to what that evidence proves is for the jury." Law v. Nat'l Collegiate Athletic Ass'n, 5 F. Supp. 2d 921, 927 (D. Kan. 1998) (citing Perkins v. Standard Oil Co., 395 U.S. 642, 648, 23 L. Ed. 2d 599, 89 S. Ct. 1871 (1969)). See also Rossi v. Standard Roofing, Inc., 156 F.3d 452, 483-84 (3rd Cir. 1998) (observing that, as to the causation element of antitrust injury, the plaintiff need only establish that "the defendants' illegal conduct was a material cause of

[his] injury")(internal quotes and citations omitted). As the Seventh Circuit recently observed, to satisfy the second, or causation component of Brunswick,a § 4 plaintiff must show that its injury "flows from that which makes defendants' acts unlawful," Brunswick, 429 U.S. at 489 -- that "but for" the alleged violation, the injuries would not have occurred. [Citations omitted]. An antitrust violation need not be the sole cause of the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury.Greater Rockford Energy and Technology Corp. v. Shell Oil Co., 998 F.2d 391, 401 (7th Cir. 1993)).

## CONCLUSION

To close the Plaintiff would like to inform the Court that he has no issues or qualms with arbitration on arbitrable issues. Plaintiff reiterates that the Defendants Arbitration agreement does not pertain to all the issues presented. Plaintiff further states that the issues he presented in regards to the Sherman Antitrust violations should proceed and not be dismissed. In regards to these broad factual situations such as this one the Court has stated the following, "Summary judgment is disfavored, of course, in heavily factual settings such as complex antitrust cases that involve issues of motive and intent. See Poller v. CBS, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)." National Basketball Ass'n v. SDC Basketball Club, Inc., 815 F.2d 562 (9th Cir. 1987)

Plaintiff states that this case is comparable to the Silver case. In Silver, a securities dealer, though not a member of the New York Stock Exchange, maintained direct private telephone wire connections with several member firms. Pursuant to the Exchange's rules, the member firms involved applied to the Exchange for approval of

the connections. After granting temporary approval for the connections as well as for a direct teletype connection and stock ticker service, the Exchange, without prior notice to Silver, disapproved of the securities market. . . Hence, absent any justification derived from the policy of another statute or otherwise, the Exchange acted in violation of the Sherman Act. Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The court in id. Further stated the following..

It is plain, to begin with, that removal of the wires by collective action of the Exchange and its members would, had it occurred in a context free from other federal regulation, constitute a per se violation of § 1 of the Sherman Act. The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market.  Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457;Associated Press v. United States, 326 U.S. 1;Klor's, Inc., v. Broadway-Hale Stores, Inc., 359 U.S. 207;Radiant Burners, Inc., v. Peoples Gas Light & Coke Co.,  **[*348]**  364 U.S. 656.

Such "concerted refusals by traders to deal with other traders . . . have long been held to be in the forbidden category," Klor's, Inc., v. Broadway-Hale Stores, Inc., 359 U.S., at 212, of restraints which "because of their inherent nature or effect . . . injuriously restrained trade," United States v. American Tobacco Co., 221 U.S. 106, 179.

Enforcement of exchange rules, particularly those of the New York Stock Exchange with its immense economic power, may well, in given cases, result in competitive injury to an issuer, a nonmember broker-dealer, or another when the

imposition of such injury is not within the scope of the great purposes of the Securities Exchange Act. Such unjustified self-regulatory activity can only diminish public respect for and confidence in the integrity and efficacy of the exchange mechanism. Some form of review of exchange self-policing, whether by administrative agency or by the courts, is therefore not at all incompatible with the fulfillment of the aims of the Securities Exchange Act.

Applicability of the antitrust laws, therefore, rests on the need for vindication of their positive aim of insuring competitive freedom. Denial of their applicability would defeat the congressional policy reflected in the antitrust laws without serving the policy of the Securities Exchange Act. Should review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented. See note 12, supra.

The collective actions of the Defendants, with their immense economic power and exclusive access to the market for the honor of representing NBA players and prospective players, here amount to a collective refusal to deal, which amounted to an immense injury to the Plaintiff, therefore the defendants have therefore violated § 1 of the Sherman Act, 15 U. S. C. § 1, and is thus liable to petitioners under §§ 4 and 16 of the Clayton Act, 15 U. S. C. §§ 15, and private treble damages.

RESPECTFULLY SUBMITTED,


__Mr. Rosel C. Hurley III__

Mr. Rosel C. Hurley III
Hurley Law LPA
12800 Shaker Boulevard, STE 230
Cleveland, OH 44120


## L.R. 7.1(F) CERTIFICATION

I hereby certify that this Memorandum complies with the page count provision set forth in Local Rule 7.1(F) for standard litigation not assigned an expedited track and does not exceed twenty pages in length.

__Mr. Rosel C. Hurley III__

Mr. Rosel C. Hurley III


## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2021 the foregoing document was electronically delivered upon Counsel(s) for the defendant, and will be filed with the Court on October 12, 2021.

__Mr. Rosel C. Hurley III__

Mr. Rosel C. Hurley III